```
           IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                       AT BLUEFIELD
```

CLIFTON LEON CHRISTEN[1],

    Plaintiff,

v.                              CIVIL ACTION NO. 1:03-2027

CONSOL ENERGY, et al.,

    Defendants.

### MEMORANDUM OPINION

By Judgment Order entered September 30, 2005, the court granted the motions for summary judgment filed by defendants. The reasons for that decision follow.

### Background

Plaintiff is a former employee of defendant Consol Energy ("Consol"). Defendant Gates McDonald acted as a benefits administrator for Consol and defendant Ron Page worked as a nurse for Gates McDonald. Defendants Terry Mason and Robert Smith were Consol employees. On January 26, 2001, plaintiff Clifton Leon Christen's ("Christen") treating physician certified him as medically unable to work. Consol sponsored for its employees a salary continuation plan ("Salary Continuation Plan" or "the

---

[1] The Complaint identifies plaintiff as "Clifton Leon Christen" whereas elsewhere in the record his last name is spelled Christian. The court has continued to spell plaintiff's last name "Christen."

Plan") which provided financial benefits to Consol employees who became "disabled" within the meaning of the Plan.

Thereafter, according to the terms of the Plan, defendants requested that Christen submit to an independent medical examination that was eventually performed by defendant Dr. Robert Ovington.[2] By letter dated July 12, 2001, Mr. Christian was informed that, based on the results of the IME, he should report to work on Saturday, July 14, 2001. The letter further informed Mr. Christian that if he disagreed with the termination of his Salary Continuance benefits, he had sixty days to request a review of the decision to terminate benefits. M&S 257, 414.[3] Plaintiff contested Dr. Ovington's findings, however, plaintiff informed Terry Mason that "he was making an official request to retire from the company." Consol 132. Plaintiff never appealed the termination of his salary continuation benefits.[4]

---

[2] Dr. Ovington was also named as a defendant in the lawsuit but, by Order entered February 11, 2004, he was dismissed as a defendant.

[3] The Administrative Record consists of Bates stamped documents Consol 1-199 and M&S 1-445. Hereafter, references to the Administrative Record will be in the form "Consol __" and "M&S ___".

[4] Upon filling out the forms necessary to activate his retirement benefits, plaintiff contends that he was denied access to his retirement and 401(k) funds. Plaintiff also contends that his medical insurance was improperly cancelled from July 11, 2001, to July 31, 2001. There is nothing in the record to suggest that plaintiff did not eventually receive all benefits which he was owed under the retirement and health benefits plans and plaintiff appears to have abandoned any claims with respect

Plaintiff commenced this action in the Circuit Court of McDowell County on June 27, 2003. In his complaint, plaintiff alleges that defendants discriminated against him on the basis of age (Count One), disability (Count Two), and constructively discharged him (Count Three), all in violation of the West Virginia Human Rights Act ("WVHRA"), W. Va. Code § 5-11-1, et seq. Plaintiff also alleges that defendants' behavior inflicted severe emotional distress (Count Four) and was negligent (Count Five).

By notice filed July 31, 2003, defendants removed the case to this court. Plaintiff moved to remand the case to state court and this court denied the motion to remand, finding that plaintiff's claims were preempted by ERISA. The defendants have filed motions for summary judgment.

### Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The moving party has the burden of establishing that there is no genuine issue as to any material fact. Celotex Corp. v. Catrett,

---

to those plans. Accordingly, the motions for summary judgment and responses thereto are directed solely towards defendants' alleged mishandling of plaintiff's benefits under the Salary Continuation plan.

477 U.S. 317, 323 (1986). This burden can be met by showing that the nonmoving party has failed to prove an essential element of the nonmoving party's case for which the nonmoving party will bear the burden of proof at trial. Id. at 322. If the moving party meets this burden, according to the United States Supreme Court, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Once the moving party has met this burden, the burden shifts to the nonmoving party to produce sufficient evidence for a jury to return a verdict for that party.

> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find, by a preponderance of the evidence, that the plaintiff is entitled to a verdict . . . .

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 250-51. The opposing party must demonstrate that a triable issue of fact exists and may not rest upon mere allegations or denials. Id. at 252.

Defendants herein contend that there are no genuine issues of material fact in dispute and, therefore, summary judgment in their favor is warranted. Plaintiff, however, argues that "[t]here are genuine issues of material fact for the jury to decide. . . ." Plaintiff's Memorandum in Opposition to Consol's Motion for Summary Judgment at 1 (hereinafter "Plaintiff's Memo at ____"). According to plaintiff, these issues include: 1) whether the standard of review is an abuse of discretion or arbitrary and capricious; 2) the differing opinions of Dr. Riaz and Dr. Ovington regarding plaintiff's ability to return to work; 3) whether the IME was truly an independent examination.

## Analysis

*A.     Standard of Review*

In Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989), the Supreme Court held that judicial review of a trustee's decision regarding eligibility for pension benefits is de novo "unless the plan at issue gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." If the administrator retains discretion, the decision is reviewed for an abuse of discretion. See id.; see also Buzzard v. Holland, 367 F.3d 263, 268 (4th Cir. 2004).

A "fiduciary's `discretionary decision will not be disturbed if reasonable, even if the court itself would have

reached a different conclusion.'  In general, `a decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" Cerra v. Harvey, 279 F. Supp. 2d 778, 782 (S.D.W. Va. 2003) (internal citations omitted).

> The Plan documents herein provide:
>
> In accordance with section 503 of Title I of ERISA, the Plan Administrator has designated one or more Named Fiduciaries (which may include itself) under the Salary Continuance Plan, each with complete authority to review all denied claims for benefits under the Salary Continuance Plan with respect to which it has been designated as a Named Fiduciary.  In exercising its fiduciary responsibilities, a Named Fiduciary shall have discretionary authority to determine whether and to what extent covered Salary Continuance Plan participants are eligible for benefits, and to construe disputed or doubtful Salary Continuance Plan terms.

M&S 442.  Because the Plan confers upon the Plan Administrator and Named Fiduciaries full and final authority for determining eligibility for benefits, the court must determine whether the decision to terminate plaintiff's benefits under the Salary Continuance Plan was an abuse of discretion.  See Buzzard, 367 F.3d at 268.  In so doing, the court's inquiry is to determine whether that decision was supported by substantial evidence.  See id.

According to plaintiff, "the defendant's argument [that] the standard of review is an abuse of discretion is in conflict with the plaintiff's assertion that the standard of review is

6

arbitrary and capricious creates a genuine issue of material fact for the jury to decide." Plaintiff's Memo at 18. Plaintiff's argument on this point is flawed in a number of ways.

First, as noted by the authorities cited above, the correct standard of review in this case is an abuse of discretion. In support of his argument that the standard of review is arbitrary and capricious, plaintiff directs the court to the following language from the plan: "A Named Fiduciary shall be deemed to have properly exercised such authority unless it has abused its discretion hereunder by acting <u>arbitrarily and capriciously</u>." Plaintiff's Memo at 12 (quoting Administrative Record at M&S 442) (emphasis in Plaintiff's Memo). However, the plan's statement as to the proper standard of review is not controlling. <u>See</u> <u>Booth v. Wal-Mart Stores, Inc.</u>, 201 F.3d 335, 343 (4th Cir. 2000) (holding that a statement in an employee benefits plan covered by ERISA, that discretionary decision of administrator made in good faith could not be overturned unless found by court to be arbitrary and capricious, did not preclude courts from reviewing decision under broader standard governing abuse of discretion.). As the <u>Booth</u> court put it:

> While the ERISA jurisprudence recognizes that parties have broad authority through contractual language to agree on the scope of benefits and the procedures to follow in applying for them, we do not understand ERISA to allow a plan to alter the established standard of judicial review of discretionary decisions for reasonableness.

<u>Id.</u>

Second, by Order entered May 4, 2004, the court adopted the Proposed Findings and Recommendation of Magistrate Judge VanDervort in which he proposed that the court find the appropriate standard of review in this case to be "abuse of discretion." Plaintiff did not file objections to the Proposed Findings and Recommendation within the required time for doing so nor did he seek leave of the court to file untimely objections. Plaintiff also did not ask the court to reconsider its Order of May 4, 2004.

Third, even if the standard of review to be used herein was in dispute (and the court finds that it is not), it would not be a question of fact for the jury. Determination of the appropriate standard of judicial review is a matter of law to be decided by the court.

Finally, as an aside, the court is confused as to why plaintiff would even want to argue that the correct standard is "arbitrary and capricious." The Fourth Circuit has explicitly stated that an "`arbitrary and capricious' standard is more deferential to the fiduciary than is an `abuse of discretion' standard." <u>Id.</u> at 341.

B.   *Was the decision to terminate benefits supported by substantial evidence?*

There is no dispute that there were differing opinions regarding plaintiff's ability to return to work. Plaintiff's

8

treating physician, Dr. Riaz, had found defendant unable to return to work.  Dr. Ovington, the independent medical examiner, concluded that plaintiff was able to return to work.

Plaintiff allegedly became unable to work on January 25, 2001 when his treating physician, Dr. Riaz Uddin Riaz, wrote a note indicating that he "[n]eeds to stay off work while treated for one week."  Consol 199.  Thereafter, on February 1, 2001 and February 6, 2001, Dr. Riaz stated that Christen needed to be off work for an additional two weeks.  M&S 350, 351.  On February 15, 2001, Dr. Riaz noted that plaintiff was seen on January 26, 2001 and February 1, 2001, and that Christen needed to remain out of work until he was evaluated in four weeks.  M&S 352.

The Plan provides that "[t]he Company, at any time, may request that [a participant] be examined by an independent physician.  The cost of this exam will be paid by the Company and the results will be binding on both the Company and the Salary Continuance recipient."  M&S at 442.  In mid-February 2001, Christen was notified that he would need to undergo an independent medical examination.

Over the next several months, Christen, through his attorney, raised numerous complaints to undergoing an IME.  See, e.g., Consol 104-05.  After several delays, an IME was scheduled with a Dr. Kelley for May 2, 2001.  Two appointments with Dr. Kelley were cancelled because of plaintiff's refusal to sign a

9

medical records release.  M&S 389, Consol 103, 157, 163, and 171. Finally, on July 2, 2001, Dr. Ovington performed the IME.

Dr. Ovington's notes revealed that he examined plaintiff for approximately four hours for a psychiatric consultation and psychological testing.  As part of this testing, Christen was administered the Bender-Gestalt, Weichsler Adult Intelligence Scale-III (WAIS-III), Wide Range Achievement Test-3 (WRAT-3), and the Minnesota Multiphasic Personality Inventory-2 (MMPI-2).

As a result of his examination, Dr. Ovington concluded:

> Mr. Christian [sic] informed me that "I don't feel like right now I'm ready to go back to work - - to be ready I'd have to want to go back!"  Actually, the real question here is whether or not, from a psychiatric or psychological standpoint, Mr. Christian is able to go back to work.  To make an analogy, Mr. Christian very probably is not able to bench press 200 pounds, even if he should be strongly motivated to do so.  On the other hand, it is extremely probable that he is capable of bench pressing 25 pounds, although he might not wish to do so.  In other words, there is an extremely important difference between whether a person is capable of doing something or whether or not they wish to do it.  Mr. Christian made it imminently clear that he does not wish to go back to work at this time and does not foresee that he will wish to go back to work at any time in the foreseeable future.  On the other hand, it is my opinion that even though he does not wish to go back to work, he is actually capable of going back to work from a purely psychiatric standpoint.  I am not aware of any physical problem which would keep him from returning to work.  Hence, very probably his decision will be to retire.  Obstinacy is a cardinal manifestation of an Obsessive-Compulsive Personality Disorder.  Although there is no question that Mr. Christian did evidently have fairly pronounced feelings of depression and

anxiety as well as resentment toward his employer at the time he stopped working on 01/26/01. Although the resentment apparently has not diminished to any significant degree, evidently the depression and anxiety have subsided considerably. Certainly he does not impress me as being so depressed or anxious at the present time as to be unable to return to work at this time should he decide that it is to his own best interest to do so. However, I believe that his anger and resentment are still of such intensity that he will elect to retire. This, of course, is his option. Also, his salary as a plant foreman has been so much higher than he could expect to receive if he were to look for employment elsewhere, he will no doubt be unwilling to work for a lower salary at some other job.

     To summarize, I do not believe that Mr. Christian is going to benefit significantly from further psychiatric treatment. I cannot state with any degree of certainty whether or not the Celexa, Doxepin and Ambien have helped much or whether or not his improvement has been primarily the result of getting away from his job. In my opinion, Mr. Christian will most likely continue to experience some depression and anxiety periodically in his life because of his Obsessive-Compulsive Personality Disorder which dates back to childhood or adolescence. People with such a personality disorder are always limited in their ability to enjoy life because of their overemphasis on work, accomplishment and achievement and their limited emphasis on hobbies, recreation, friendship and so forth. In other words, I do not foresee that he will ever become a "fun" person. However, this is not going to be modified much by continued psychiatric treatment. He does definitely need to develop some hobbies and also friendships. In my opinion, from a practical standpoint, he has obtained his maximum degree of medical improvement. However, he will probably elect to continue with his outpatient psychotherapy. Again, I definitely believe that he is capable of returning to work - - but that he does not desire to do so.

M&S 281-82. As the foregoing passage makes clear, Dr. Ovington's opinion was reasonable and based upon examination and testing.

In addition, Dr. Ovington reviewed the records from Christen's treatment with Dr. Riaz and gave reasons for the weight he gave those opinions.

> Subsequent progress notes by Dr. Riaz remained extremely brief with no real clarification as to whether any progress was being made in Mr. Christian's outpatient psychotherapy as regards his alleged "Major Depression" and when, if ever, Dr. Riaz thought that the [sic] he would be capable of returning to his job if he desired to do so. <u>In fact, there was no actual clarification as to whether Mr. Christian was actually unable to return to the workforce from a psychiatric standpoint or whether he was not motivated to return to his former employment.</u>

M&S 275 (emphasis in original). Given Dr. Ovington's very specific reasons for his treatment of Dr. Riaz's diagnoses, it is clear that his conclusions were the result of a "deliberate, principled reasoning process." Furthermore, ERISA plan administrators are not required to accord any special deference to the opinions of treating physicians over those of non-treating consultants. <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 834 (2003).

The Fourth Circuit has stated that where a fiduciary both administers and funds the plan, as Consol does here, the standard of review should be adjusted to decrease deference to the administrator in proportion to the degree of the administrator's

conflict of interest.  <u>Bailey v. Blue Cross & Blue Shield of Virginia</u>, 67 F.3d 53, 56 (4th Cir. 1995).  However, even under a reduced level of deference, the decision to terminate benefits was not an abuse of discretion.

C.       *Alleged Lack of Independence of Dr. Ovington*

Christen also makes much ado about an alleged lack of independence on the part of Dr. Ovington.  In support of this theory, plaintiff contends that Dr. Ovington is "regularly employed by Gates McDonald and has a reputation in the medical community of being willing to order employees back to work against the advice of the treating physician."  Plaintiff's Memo at 16.  Plaintiff, however, offers no evidence to support this statement.  In his responses to discovery, Dr. Ovington indicated that: 1) there was no contract between himself and any of the defendants; and 2) that he had conducted IMEs for as many as three Consol employees (including plaintiff) in as many years.

Plaintiff seizes upon a couple of emails between employees of Gates McDonald and Consol which he contends are evidence of Dr. Ovington's bias.  In response to an email informing him of the results of the IME, Terry Mason responded, "I knew this was crap all along. . . too bad it took 6 months to resolve."  M&S 419.  Phil Nicholson then stressed the need to follow all procedures in handling plaintiff's return to work, stating that "we want to be squeaky clean."  M&S 419.  Plaintiff

13

also relies on a May 11, 2001 email from Helen Churilla to Ron Page when they were trying to set up the IME. Ms. Churilla stated "R.C. Covington is the Psych That we have had good results with in the past."[5] Consol 94. Even viewed in the light most favorable to plaintiff, however, these statements do not indicate a lack of independence on the part of Dr. Ovington, much less one sufficient to defeat summary judgment. Furthermore, the appointment with Dr. Ovington was scheduled only after two other appointments with Dr. Kelley were rescheduled because of plaintiff's failure to have his medical records released in time. The fact that the IME was originally scheduled with Dr. Kelley supports a reasonable inference that there was no conspiracy between Dr. Ovington and defendants to terminate plaintiff's benefits.

## Conclusion

For the aforementioned reasons, the court found that the fiduciaries' decision was supported by substantial evidence and granted defendants' motions for summary judgment.[6]

---

[5] As defendants point out in their reply brief, the email does not contain any further indication of what might be meant by "good results."

[6] Because the court has determined that the fiduciaries did not abuse their discretion in terminating plaintiff's benefits under the Plan, it has not considered the other arguments raised by Gates McDonald and Ron Page in support of their motion for summary judgment.

The Clerk is directed to mail copies of this Memorandum Opinion to all counsel of record.

It is SO ORDERED this 31st day of October, 2005.

ENTER:

*David A. Faber* (signature)

David A. Faber
Chief Judge